Beth E. Terrell, WSBA # 26759
Michael D. Daudt, WSBA @25690
Michael F. Ram, *of Counsel*
TERRELL MARSHALL DAUDT & WILLIE PLLC
Attorneys for Plaintiffs
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
Telephone:  (206) 816-6603
Facsimile:  (206) 350-3528
Email:  bterrell@tmdwlaw.com
Email:  mdaudt@tmdwlaw.com
Email:  mram@rocklawcal.com

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CENTER FOR FOOD SAFETY; TOM STAHL; and CLARMAR FARMS INC., on behalf of themselves and all others similarly situated, <br><br>              Plaintiffs, <br><br>      v. <br><br> MONSANTO COMPANY, <br><br>             Defendant. | NO.  CV-13-213-JLQ <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY** |

## I.  INTRODUCTION

1.    Plaintiffs Center for Food Safety ("Center" or "CFS"), as well as

Tom Stahl and Clarmar Farms ("Farmer Plaintiffs"), by their undersigned

1  counsel, on their own behalf and on behalf of all others similarly situated, upon

2  personal knowledge as to themselves and their own acts, and upon information

3  and belief as to all other matters, allege in support of this Plaintiffs' Class Action

4  Complaint ("Complaint") as follows:

5

6  ## II.  NATURE OF THIS ACTION

7       2.    Genetically-engineered wheat resistant to the herbicide Roundup was

8  developed and field tested by Defendant Monsanto Company ("Monsanto") in 16

9  states, including Oregon, from 1998 through 2005.  No genetically-engineered

10 wheat has been approved for commercial planting or sale.

11      3.    Monsanto dropped its development of genetically-engineered wheat

12 in 2004 following concerns from U.S. farmers that it could endanger wheat

13 exports.  No genetically-engineered wheat has been approved in any foreign

14 country, including any country to which U.S. farmers export wheat.

15      4.    The United States Department of Agriculture's ("USDA") Animal

16 and Plant Health Inspection Service ("APHIS"), the Food and Drug

17 Administration ("FDA"), and the U.S. Environmental Protection Agency ("EPA")

18 share responsibility for regulating biotechnology products to ensure that approved

19 products developed in the U.S. pose no risk to human health or the environment.

20 Genetically-engineered wheat is a "regulated article" that cannot be

21 commercialized without regulatory approval.  Monsanto has not obtained

22

23

24

25

26

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 2

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

regulatory approval for genetically-engineered wheat and decided in May 2004 to defer its pursuit of regulatory approval for "Roundup Ready" genetically-engineered wheat due to considerable market resistance.

5.      At the time it was field testing genetically-engineered wheat up to the present-day, Monsanto knew that non-genetically engineered wheat could become contaminated with genetically-engineered wheat through a wide variety of means, including cross-pollination and commingling of seed during harvest, storage, transport, and/or disposal.

6.      Monsanto failed to take the steps necessary to prevent cross-pollination with non-genetically engineered wheat. Additionally or alternatively, Monsanto knew, or should have known, before it grew or otherwise disseminated genetically-engineered wheat, that such cross-pollination could not be prevented.

7.      Monsanto also failed to take the steps to prevent commingling of genetically-engineered wheat with non-genetically engineered wheat during test planting, harvest, handling, storage, transport and/or disposal. Additionally or alternatively, Monsanto knew, or should have known, before it grew or otherwise disseminated genetically-engineered wheat that the U.S. wheat production and marketing chain is a commodity-based system that gathers, commingles, and ships wheat from thousands of farms, that widespread commingling of

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF - 3

genetically-engineered wheat with non-genetically engineered wheat could not be prevented.

8.      Farmer Plaintiffs are wheat farmers in the Pacific Northwest who have commercially cultivated and/or harvested non-genetically engineered soft white wheat.  Farmer Plaintiffs seek relief on their own behalf and behalf of all others similarly situated for compensatory and consequential damages, punitive and exemplary damages.  All Plaintiffs also seek and declaratory and injunctive relief arising from, inter alia:

(a)      Monsanto's failure, either by itself or through its agents, to adequately warn soft white wheat growers of the necessary precautions and limitations to prevent genetically-engineered wheat from commingling with non-genetically engineered wheat;

(b)      Monsanto's dissemination of genetically-engineered wheat with the knowledge that it was not approved by regulatory authorities yet was likely to contaminate non-genetically engineered wheat through cross-pollination, commingling, or other means;

(c)      Monsanto's dissemination of genetically-engineered wheat with the knowledge that it was likely to contaminate through commingling with non-genetically engineered wheat in cultivation, harvesting, handling, storage, transport and disposal; and

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF - 4

(d)    The harm to Plaintiffs and the Class resulting from the genetically-engineered wheat's contamination of the general wheat supply in the form of, inter alia, (i) diminished prices for soft white wheat resulting from loss of export and domestic markets for that wheat; (ii) diminished prices for soft white wheat and/or increased grower costs resulting from the need to, inter alia, maintain the integrity of the soft white wheat supply and/or to keep genetically-engineered wheat from further entering the general wheat supply and export channels; and (iii) through the contamination of the entire wheat farming and production chain, including, but not necessarily limited to, farmland, farming equipment, harvesting equipment, seed cleaning and conditioning apparatus, storage facilities, and transportation facilities and equipment.

## III.  JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq*.

10.    This Court has jurisdiction over the Defendant because it is a corporation actively doing business and does sufficient business in Washington, has sufficient minimum contacts in Washington, or otherwise intentionally avails itself of the markets within Washington, through manufacturing, production, promotion, sale, marketing and distribution of its products in Washington, to render the exercise of jurisdiction by this Court proper and necessary.

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTION RELIEF - 5

11.     Venue is proper in this District of Washington pursuant to 28 U.S.C. § 1391 because Defendant provides services to Class members located in this District, conducts substantial business in this District, or otherwise has sufficient contacts with this District to justify it being fairly brought into court in this District.

## IV.  PARTIES

### Plaintiffs

12.     Plaintiff Tom Stahl owns and operates a farm in Waterville, Douglas County, Washington.  Tom Stahl grew soft white wheat at all times during the relevant time period.  Tom Stahl has never knowingly grown genetically-engineered wheat.

13.     Plaintiff Clarmar Farms, Inc. owns and operates a farm in Waterville, Douglas County, Washington.  Clarmar Farms, Inc. grew soft white wheat at all times during the relevant time period.  Clarmar Farms, Inc. has never knowingly grown genetically-engineered wheat.

14.     Plaintiff Center for Food Safety ("CFS") brings this action on behalf of itself and its members.  CFS and its members are being, and will be, adversely affected by Monsanto's actions.  CFS is a Washington, D.C. public interest non-profit membership organization that has offices in San Francisco, California, Portland, Oregon, and Washington, D.C.

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 6

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

15.    Since the organization's founding in 1997, CFS has sought to ameliorate the adverse impacts of industrial farming and food production systems on human health, animal welfare, and the environment.  CFS also supports and promotes sustainable forms of agriculture, including organic systems.  CFS has over 300,000 consumer and farmer members, in almost every state across the country, including thousands of members in many states and locations where white wheat is grown.

16.    CFS seeks to protect human health and the environment by advocating thorough, science-based safety testing of GE products prior to any marketing; cultivation of GE crops in a manner that minimizes any risk of contaminating conventional food supplies or the environment, and that minimizes negative impacts such as increased use of pesticides and evolution of resistant weeds; and appropriate labeling of foods that are or contain GE products.  CFS also seeks to provide consumers with a means of identifying GE foods on the market and to encourage full public participation in defining the issues presented by GE crops.

17.    To achieve its goals, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational materials addressing the introduction of GE crops into the environment and food supply. These materials include, but are not limited to,

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 7

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

reprints of news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets.  CFS also sends out action alerts to its True Food Network; these action alerts generate public involvement, education and engagement with governmental officials on issues related to genetic engineering and other issues affecting a sustainable food system.  Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement and governmental oversight of the use of genetic engineering in our nation's food supply.  Where necessary, CFS engages in public interest litigation to address the impacts of GE crops on the environment, its members and the public interest.

**Defendant**

18.     Monsanto Company is a Delaware corporation headquartered at 800 North Lindbergh Boulevard, Saint Louis, Missouri, 63167.  Monsanto sells products including field crop and vegetable seeds, plant biotechnology traits, and pesticides.  The global company has over 20,000 employees with 404 facilities in 66 countries.

19.     The original Monsanto Company entered into a merger with Pharmacia & Upjohn, Inc. in December 1999 and changed its name to Pharmacia Corporation in 2000.  A new Monsanto Company, based on the previous agricultural division of Pharmacia, was incorporated in Delaware as a wholly-owned subsidiary of Pharmacia under the name Monsanto AG Company in

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 8

February 2000.  When the merger became effective on March 31, 2000, the new

Monsanto changed its name from Monsanto AG Company to Monsanto

Company.  Pursuant to a separation agreement signed in September 2000 with

Pharmacia related to the transfer of the operations, assets and liabilities of the

agricultural business from Pharmacia to the new Monsanto Company, the new

Monsanto Company was required to indemnify Pharmacia for any liabilities

related to the agricultural business or chemicals business, and for any liabilities

assumed by Solutia prior to the distribution agreement.

20.    In August 2002, Pharmacia distributed its shares to shareholders via

a stock dividend – resulting in Pharmacia divesting itself of any equity interest in

Monsanto.  In April 2003, pursuant to a merger transaction, Pharmacia became a

wholly-owned subsidiary of Pfizer.  In December 2003, Monsanto assumed the

management of certain tort litigation and environmental obligations related to its

chemical business.

21.    Pharmacia itself eventually became a subsidiary of Pfizer in 2003.

There is currently no control relationship between Monsanto and Pharmacia, and

the indemnification obligations among the companies are ongoing.

22.    Monsanto conducts business throughout the United States, including

the states in which the named Plaintiffs herein cultivate and/or harvest wheat.

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF - 9

**TERRELL MARSHALL DAUDT & WILLIE PLLC**
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

## V.  FACTUAL ALLEGATIONS

**A.      Wheat Cultivation in the United States and Northwest States**

23.      Wheat is the principal U.S. cereal grain for export and domestic consumption.  In terms of value, wheat is the fourth-leading U.S. field crop and serves as the nation's leading export crop.

24.      According to U.S. Wheat Associates, about $8.1 billion in wheat was exported in 2012, representing half of the total $17.9 billion wheat crop.  Overall, about 50 percent of U.S. wheat is exported.

25.      Pacific Northwest Soft White contains soft white wheat primarily from Washington, Oregon, and Idaho.  The three states together produced 86 percent of total US soft white wheat in 2008.26.      About 90 percent of Oregon's wheat crop is exported.  Oregon's total wheat crop is valued at $300 million to $500 million per year.  Soft white wheat dominates Oregon's total wheat production, with soft white wheat totaling 89 percent of the state's wheat production in 2011.

26.      In 2008, soft white wheat accounted for 79 percent of total wheat production in Washington state.  More than 46 percent of all U.S. white wheat comes from Washington alone.  Washington is one of the nation's leading wheat-exporting states, with 85 to 90 percent of its production exported each year.

**TERRELL MARSHALL DAUDT & WILLIE PLLC**
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

27.    Idaho ranks fifth nationally in the production of all wheat. In 2011, soft white wheat accounted for approximately 57 percent of total wheat production in Idaho.  Nearly 50 percent of Idaho's wheat is exported each year.

28.    Used for white bread, pasta, noodles, pizza and pastries, wheat has been the principal cereal crop in the United States since the 1700s.

29.    Today, approximately 85 to 90 percent of the Pacific Northwest's soft white wheat crop is exported to Japan, South Korea, Taiwan and other nations, where it is used to make noodles and crackers.

30.    Six classes of wheat are currently produced in the United States. The location of each class of wheat depends largely upon rainfall, temperature, soil conditions and tradition.  The Pacific Northwest states of Oregon, Washington, and Idaho, as well as portions of Montana and Northern California, grow the "soft white wheat" variety, which produces flour for baking cakes, crackers, cookies, pastries, quick breads and muffins.  This wheat is also grown in Michigan and New York.  Soft white wheat primarily is exported to the Far East Asian region.

31.    In addition to soft white wheat, the other classes of wheat are: (1) hard red winter produced in the Great Plains states; (2) hard red spring produced in Montana, North Dakota and Minnesota; (3) soft red winter grown primarily east of the Mississippi River; (4) durum produced in similar states to hard red

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1    spring, primarily North Dakota; and (5) hard white wheat produced in a variety of

2    states including Idaho, Kansas, Nebraska, and California.  The following map

3
4    shows the primary growing locations of all six wheat classes:

5

6
7
8
9
10
11
12
13
14
15



16    ● HARD RED WINTER   ● HARD RED SPRING   ● SOFT RED WINTER   ● SOFT WHITE   ● HARD WHITE   ● DURUM

17

18   **B.**    **Roundup Resistant Genetically-Engineered Wheat**

19        32.    Monsanto genetically has engineered "Roundup Ready" wheat to

20   include a genetic construct that makes the wheat resistant to the broad-spectrum

21
22   herbicide glyphosate (also known by the branded name Roundup®).

23        33.    Monsanto authorized 279 field tests with this specific glyphosate-

24   resistant wheat trait in years spanning from 1998 through 2005.  Field tests were

25
26   conducted in Arizona, California, Colorado, Florida, Hawaii, Idaho, Illinois,

**TERRELL MARSHALL DAUDT & WILLIE PLLC**
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1  Kansas, Minnesota, Montana, Nebraska, North Dakota, Oregon, South Dakota,

2  Washington, and Wyoming.  Monsanto has not disclosed the specific locations of

3  
4  the company's field trials.

5      34.     No Roundup Ready wheat, or any other genetically-engineered

6  wheat, has been authorized for commercial sale in the United States or anywhere

7  
8  else in the world.

9      35.     Monsanto dropped the project and never sought approval based on

10 concerns from U.S. farmers that genetically-engineered wheat could endanger

11 
12 wheat exports.  Although most American soybeans and corn are genetically

13 engineered, these crops are largely consumed by animals or made into processed

14 foods.  Wheat products in contrast are consumed directly by people, and many

15 
16 consumers around the world reject genetically engineered products.  In addition,

17 many of the countries to which the US exports wheat do not import genetically-

18 engineered food products.  A 2005 study estimated that the national wheat

19 
20 industry could lose $94 million to $272 million annually if genetically-engineered

21 wheat were approved.

22     36.     In the planting, growing, harvesting, transporting, storing and/or

23 
24 disposing of the genetically-engineered wheat field tested between 1998 and

25 2005, Monsanto failed to comply with reasonable growing practices.  Monsanto

26 knew that it was impossible to completely isolate the genetically-engineered

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 13

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1   wheat from other varieties of soft white wheat and that the genetically-engineered

2   wheat would inevitably cross-pollinate, commingle with other wheat seeds and/or

3

4   find its way into the food chain through other Monsanto acts or omissions as it

5   has now done.

6   **C.    Discovery of Genetically-Engineered Wheat in Eastern Oregon**

7          37.    In May 2013, a farmer in Eastern Oregon trying to clear his fields

8   noticed that some plants he had sprayed with the herbicide glyphosate (the key

9

10  ingredient in Monsanto's Roundup) had not died.  The grower found the

11  Roundup-resistant wheat dispersed throughout the field and not concentrated in

12

13  any one location.

14         38.    The 125-acre field where the genetically engineered wheat was

15  found was one of several the grower had planted in the fall of 2011 with the soft

16

17  white winter wheat varieties "Rod" and "WB528."  The grower used two types of

18  wheat in his fields that had never been used in Monsanto's trials.

19         39.    "Rod" is a semi-dwarf soft white wheat variety with good cold

20

21  hardiness that was developed by Washington State University.  The public

22  variety, released in 1992, was planted on about 8,000 acres in the region in 2011,

23  according to the figures.

24

25

26

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 14

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

40. "WB528" is a semi-dwarf soft white winter wheat variety developed by WestBred, of Bozeman, Montana. WestBred was purchased by Monsanto in 2009.

41. Russ Karow, head of the Department of Crop and Soil Sciences at Oregon State University, said that to his knowledge neither Rod nor WB528 had been genetically engineered with the Roundup Ready gene. "From what I know, the work done in the (late 1990s and) early 2000s, that was all done with a variety called Bobwhite," Karow said. Bobwhite is a spring wheat variety.

42. The farmer who discovered the genetically engineered wheat reported the finding to an Oregon State University researcher, who tested plant samples using "Roundup Ready" quick test strips and genetic analysis. The results confirmed that the plants contained genetic constructs making them resistant to glyphosate. The farmer's field was never used for trials of Monsanto's Roundup-resistant wheat.

43. After the Oregon State researchers determined that the plants contained the glyphosate-resistant gene, federal scientists also confirmed that the plants were resistant to glyphosate herbicide. On May 28, 2013, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (APHIS) announced the results and publicized that an unauthorized Roundup Ready genetically-engineered trait had been detected in volunteer wheat from the

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF - 15

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

Eastern Oregon farm in question.  The announcement stated that APHIS will investigate to determine how this regulated article appeared outside of a confined test environment.  On June 3, 2013, a spokesman with the USDA stated that a team of 15 investigators is collecting evidence and information.

44.     The announcement led to immediate concern that the development could disrupt exports of soft white wheat from the Pacific Northwest.  For example, on May 28, 2013, the Japanese Ministry of Agriculture, Food and Fisheries (MAFF) did not purchase soft white wheat in its regular tender, but did purchase its regular allotment of red spring wheat and red winter wheat.  An official with the Japanese Embassy stated that the country would cancel orders for Pacific Northwest soft white wheat because Japanese people were "concerned about the discovery of unapproved wheat."

45.     Similarly, it was reported on May 31, 2013, that Japan had postponed a 25,000-ton order of soft white wheat from a Portland, Oregon grain shipper and that South Korea and the European Union have called for tests of American wheat.  In particular, South Korea has increased inspections of incoming American wheat.  Chinese officials said they would be "monitoring the situation" and Japan's consul general in Portland said on May 31 that his country would need assurance that Oregon wheat is safe before continuing to import the soft white wheat variety.  Japan's decision to suspend soft white wheat imports

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 16

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

from the Pacific Northwest led traders to forecast potential long-term effects on the wheat industry: "Nobody's going to want to buy wheat from the PNW (Pacific Northwest) for a while," said an analyst with the Linn Group.

46.     On June 3, 2013, *The Wall Street Journal* reported that Japan would hold back shipments of previously-contracted soft white wheat from processors as a precautionary measure. This action impacts several cargo shipments of soft white wheat that had been purchased before Japan suspended imports from the Pacific Northwest, but had yet to be delivered to the country.

47.     In Taiwan, the Taiwan Flour Mills Association announced it would not accept soft white wheat from Oregon and asked suppliers for assurances that future shipments would be free from genetically-engineered wheat. It was reported on June 3, 2013 that Taiwan's Council of Agriculture and Department of Health are conducting an ongoing investigation.

48.     Some researchers and crop scientists do not believe that the genetically-engineered plants were found in the Eastern Oregon field as a result of "gene flow." Although a 2005 Oregon State study showed that it is possible in some instances for genetic traits to pass from one wheat plant to another through pollen, for example, this process occurs at a very low rate and the maximum "flow" range is limited to 120 feet.

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

49.     Moreover, the genetically-engineered wheat tested in Oregon as part of the Monsanto trials in 2000-01 was a spring-planted variety, while the wheat found in the Eastern Oregon field was a winter variety.  Thus, the unapproved wheat in Oregon is indicative of widespread contamination, as opposed to wheat remaining from Monsanto's earlier field trials.

**D.     Monsanto's Knowledge of Genetically-Engineered Wheat Concerns**

50.     Monsanto was well aware of concerns regarding the health and safety of genetically-engineered wheat and the potential detrimental market effects arising from the use of such crops.

51.     After conducting the field tests, Monsanto dropped its development of genetically-engineered wheat in 2004, following concerns from U.S. farmers that genetically-engineered wheat could endanger wheat exports.  In a statement made on May 9, 2004, Monsanto acknowledged that there was "not a sufficient market to make the introduction of its GE wheat worthwhile" and said it would concentrate on other crops, such as corn, cotton and oilseeds.

52.     A May 11, 2004 article in the *New York Times* reported that Monsanto's wheat "was genetically engineered to be resistant to Monsanto's Roundup herbicide, which would allow farmers to spray their fields to kill weeds while leaving the crop intact.  While Roundup Ready wheat attracted the expected opposition from consumer groups and environmental advocates, what was

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

unusual in this case was the opposition of many American and Canadian farmers, who have eagerly adopted other biotechnology crops.  These farmers say that wheat buyers in Europe, Japan and some other countries had told them they would not buy genetically engineered wheat because they thought consumers did not want it."

53.    Recent news articles have reported that Monsanto has started conducting field trials of a new GE wheat version in two states.  A Bloomberg News article reported on May 31, 2013 that Monsanto planted 150 acres of wheat in Hawaii last year that was genetically engineered to tolerate glyphosate and tested an additional 300 acres of wheat engineered with glyphosate tolerance in North Dakota this year.  The same article quoted a Monsanto statement from late May 2013 where the company said it had completed "closing out the Roundup Ready wheat program" nine years ago.

54.    Monsanto knew, or should have known, that the existence of genetically-engineered wheat – commingled within the general wheat supply – would cause significant disruptions in the wheat export market, and that such a situation could involve huge disruptions in the wheat trade while imposing additional costs on U.S. wheat farmers and specifically Pacific Northwest soft white wheat farmers.  These costs eventually would detrimentally impact

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

worldwide prices for Pacific Northwest soft white wheat, causing significant

financial damage to wheat farmers.

55.     Despite this knowledge, Monsanto tested genetically-engineered

wheat from 1998 to 2005 without adequate safeguards to prevent its release into

fields where it could comingle with non-genetically engineered wheat.

56.     Monsanto failed to instruct, oversee or control field trial operators

adequately to ensure that its genetically-engineered wheat was adequately

segregated, at least, in part, because Monsanto was confident during the testing

time period of 1998 to 2005 that genetically-engineered wheat would eventually

be approved for commercial use, including export.  Such wrongful conduct by

Monsanto led directly to contamination and market deterioration problems that

damaged Plaintiffs and all soft white wheat farmers.

57.     Monsanto knew, or should have known, of the potential that

genetically-engineered wheat from prior field testing could have spread.  Indeed,

similar releases of unapproved crops have impacted the corn and rice markets.

58.     A science policy analyst from the Center for Food Safety stated that

it has been 12 years since field testing trials occurred in Oregon.  According to

the analyst, "It's highly doubtful that it's just on one farm. If it's out there, it's out

there . . . it's been 12 years since this wheat was grown officially in Oregon. It

doesn't just disappear and magically reappear 12 years later."

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

59.    As a result of unapproved genetically-engineered wheat being found in a field in Eastern Oregon in May 2013 confidence in the integrity and safety of the Northwest's soft white wheat crop has evaporated in those markets.

60.    Due to Monsanto's wrongful conduct, soft white wheat destined for export markets for use in food products has been rejected for the purposes for which it was intended.  Because scheduled shipments already have been postponed and canceled, the presence of genetically-engineered wheat has detrimentally impacted the domestic and global wheat markets and damaged Plaintiffs and other wheat farmers.

61.    As a result of Monsanto's wrongful conduct, Japan, one of the largest foreign markets for U.S. wheat, has already halted imports and expressed continuing concerns about the safety of soft white wheat.

62.    Similarly, as a result of Monsanto's wrongful conduct, the European Union is urging its 27 member states to test certain wheat shipments from the United States.  The EU imports more than 1.1 million tons of U.S. wheat each year, with soft white wheat accounting for 80 percent of that total.  According to news reports in the Washington Post, a representative from the E.U. stated that it would act to "ensure E.U. zero-tolerance policy [for genetically engineered wheat] is implemented."

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

**E.    The Further Impact of Genetically-Engineered Wheat on Plaintiffs and Other Wheat Farmers**

63.    The discovery of genetically-engineered wheat in an Eastern Oregon field, as a result of Monsanto's wrongful conduct, has detrimentally affected the ability of Farmer Plaintiffs and all other non-GE soft white wheat farmers to sell their wheat into export channels through the storage, handling, processing, and export companies.  Furthermore, many wheat exporters will undertake and require expensive and time-consuming testing of all wheat crops prior to purchasing them from farmers to determine whether they have genetically engineered content and are fit for export.  Even if no genetically engineered content is detected, the economic burden of testing will be transferred to soft white wheat farmers by, inter alia, diminished bids for wheat brought to the market.

64.    The impact of testing will additionally burden wheat farmers by, inter alia, potentially requiring loads of wheat that test positive to be destroyed and deemed unfit for human consumption or barred from export.

65.    Moreover, the presence of genetically-engineered wheat has and will result in the loss of certain markets within the United States and certain export markets for soft white wheat and, coupled with the above-described export declines, has and will continue to result in reduced prices for all soft white wheat.

**TERRELL MARSHALL DAUDT & WILLIE PLLC**
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

66.    Furthermore, the cost of segregating non-genetically engineered soft white wheat from genetically-engineered wheat will be significant.  As a result of Monsanto's wrongful conduct, soft white wheat farmers will have to take extra steps to attempt to preserve the integrity and economic value of their wheat crops.

67.    Wheat farmers have also sustained damages to their property as a result of Monsanto's wrongful conduct, through the potential contamination of the entire wheat farming and production chain, including, but not necessarily limited to, farmland, farming equipment, harvesting equipment, seed cleaning and conditioning apparatus, storage facilities, and transportation facilities and equipment.

68.    Monsanto's wrongful conduct continues to place all Plaintiffs and all other wheat farmers at risk for further damages caused by the cross-pollination, commingling, and contamination of their soft white wheat crops with genetically-engineered wheat and from the continued detrimental market effects of the contamination on U.S. wheat prices, especially for exports.

## VI.  INJURIES TO PLAINTIFFS AND WHEAT FARMERS

69.    The detection of genetically-engineered wheat in an Eastern Oregon field has already resulted in the loss of certain export markets and domestic markets for soft white wheat and will continue to do so.

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

70.     Market changes resulting from the commingling of genetically-engineered wheat with non-genetically engineered wheat has created inefficiencies expressed in, inter alia, lower prices and higher producer costs.

71.     Many wheat buyers will not accept deliveries without proof that the soft white wheat crops being delivered to them do not possess any traces of genetically-engineered wheat, thus requiring expensive and time-consuming testing.  Furthermore, the costs of storing and moving any other discoveries of genetically-engineered wheat through segregated channels will be significant.  Storage and transportation entities will need to design and use systems and equipment for testing and segregation, rather than handling all soft white wheat products the same way.  Plaintiffs and all other members of the Class will share the economic burden of these costs.

72.     As set forth above, the impact of testing for genetically-engineered wheat at various points in the wheat marketing channel will add extra expense by leaving wheat that tests positive out of certain markets.  Plaintiffs and all other members of the Class will share the economic burden of these costs.

73.     Commodities traders, financial reporters, and agricultural officials have stated that the presence of genetically-engineered wheat has and will continue to impact soft white wheat prices, wheat futures prices, and U.S. wheat exports detrimentally.

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 24

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

74.    As a result of Monsanto's wrongful conduct, soft white wheat farmers have also suffered harm to their property through the contamination of the wheat farming and production chain, including, but not necessarily limited to, farmland, farming equipment, seed cleaning and conditioning apparatus, harvesting equipment, storage facilities, and transportation facilities and equipment.

75.    The interests of CFS and their members are being, and will be, adversely affected by Monsanto's actions complained of herein.  Defendant's actions ensure that CFS's members are, and will be, aesthetically, economically, and physically injured by the spread of genetically-engineered wheat.  CFS has consumer and farmer members in almost every state across the country, including many thousands of members in states and locations where white wheat is being grown.  CFS's members also regularly eat organic and natural foods, and desire foods that are free of GE products or derive from animals not fed such GE products.  The potential for transgenic contamination of genetically-engineered wheat will reduce the supply and food that is not contaminated with GE material.  Defendant's actions in allowing the introduction of genetically-engineered wheat into the environment will imminently make it more difficult for CFS's members to produce, sell, and eat wheat that is not contaminated by GE materials.

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

76.    Plaintiffs and all members of the Class have been damaged and are at continuing risk of further damages arising out of Monsanto's wrongful conduct.

## VII.  CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring these claims against Monsanto, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), individually and on behalf of a class consisting of:

> All persons and entities who grew, owned, cultivated, harvested and/or had planted soft white wheat from May 29, 2013 to present.  Excluded from this Class are the Court and its employees; Monsanto; any parent, subsidiary, or affiliate of Monsanto; and all employees and directors who are or have been employed by Monsanto during the relevant time period.

78.    Plaintiffs reserve the right to amend this class definition prior to class certification.

79.    Farmer Plaintiffs seek to represent the class for any damages, injunctive, and declaratory relief.  CFS seeks injunctive and declaratory relief only.

80.    The Class is so numerous and geographically dispersed among four large states that joinder of all members is impracticable.  The exact number and identity of Class Members is not known.  Plaintiffs believe that thousands of persons cultivated and/or harvested soft white wheat during the relevant time

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 26

1    period and would be members of the class.  Accordingly, Rule 23(a)(l)  is thus

2    satisfied.

3        81.    Common questions of fact and law exist here, satisfying the

4
5    requirement of Rule 23(a)(2),  including but not limited to:

6            (a)    Whether Monsanto is liable to Farmer Plaintiffs and the other

7
8    members of the Class for damages, and the proper measure of such damages;

9            (b)    Whether Plaintiffs and the other Class Members are entitled to

10   injunctive relief to decontaminate their farming, harvesting, and transportation

11
12   equipment, and their on-farm storage facilities, to monitor and investigate, and

13   prevent contamination in future growing seasons;

14           (c)    Whether Monsanto is responsible for contamination of non-

15
16   genetically engineered soft white wheat;

17           (d)    Whether Monsanto field tested genetically engineered wheat

18   in such a manner that commingling of genetically engineered with non-

19
20   genetically engineered wheat was reasonably foreseeable;

21           (e)    Whether Monsanto was negligent or negligent per se in its

22   supervision of field testers who oversaw the testing program affiliated with

23
24   genetically-engineered wheat from 1998 to 2005;

25           (f)    Whether Monsanto was negligent or negligent per se in the

26   testing, growing, storing, transport and disposal of genetically-engineered wheat;

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 27

(g)     Whether Monsanto's conduct in contaminating the soft white wheat supply and the entire wheat farming and production chain constitutes a public nuisance;

(h)     Whether Monsanto's conduct in contaminating Farmer Plaintiffs' and/or Class Members' farmland and equipment constitutes private nuisance;

(i)     Whether Monsanto is strictly liable for damages caused by its testing, growing, storing, transport and disposal of genetically-engineered wheat;

(j)     Whether Monsanto is liable to Farmer Plaintiffs and Class Members for damages and the proper measure of such damages; and

(k)     Whether Plaintiffs are entitled to a judgment declaring that the practices of Defendant are unlawful.

82.     Farmer Plaintiffs' claims are typical of the other Class Members' claims and do not conflict with the interests of any other Class Members, as Farmer Plaintiffs and all Class Members were damaged by Monsanto's wrongful conduct, and the relief Farmer Plaintiffs seek is common to the relief sought on behalf of the Class.  Rule 23(a)(3) is thus satisfied.

83.     Farmer Plaintiffs will fairly and adequately protect the interests of the other Class Members and have no interests that are antagonistic to or which conflict with those of other Class Members.  Farmer Plaintiffs are committed to

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF - 28

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1   the vigorous prosecution of this action and have retained competent counsel

2   experienced in litigation of this nature to represent them and the members of the

3   Class.  Rule 23(a)(4) is thus satisfied.

4

5           84.     Absent a representative class action, members of the Class would

6   continue to suffer the harm described herein, for which they would have no

7   remedy.  Even if separate actions could be brought by individual farmers, the

8   resulting multiplicity of lawsuits would cause undue hardship and expense for

9   both the Court and the litigants, as well as create a risk of inconsistent rulings and

10

11  adjudications that might be dispositive of the interests of similarly situated

12  farmers, substantially impeding their ability to protect their interests, while

13  establishing incompatible standards of conduct for Monsanto.  The proposed

14  Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(l).

15

16          85.     Monsanto has acted and/or refused to act on grounds generally

17  applicable to Farmer Plaintiffs and the other Class Members, thereby rendering

18  class certification and injunctive and/or declaratory relief with respect to the Class

19  as a whole appropriate as well.  Certification under Fed. R. Civ. P. 23(b)(2)

20  would, therefore, be appropriate.

21

22          86.     As discussed above, numerous common questions of fact and law

23  exist.  These questions predominate over the individual questions presented in

24  this action.  The predominance requirement of Rule 23(b)(3) is thus satisfied.

25

26

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 29

87.    A class action is the superior method for the fair and efficient adjudication of this controversy, because joinder of all Class Members is impracticable.  Because the damages suffered by individual Class Members may be relatively small, the expense and burden of litigation would prevent Class Members from individually redressing the wrongs done to them.  Where, as here, the size and nature of individual Class Members' claims would allow few, if any, Class Members to seek legal redress against Monsanto for the wrongs complained of herein, a representative class action is both the appropriate vehicle by which to adjudicate these claims and is essential to the interests of justice.  Furthermore, a class action regarding the issues in this Court creates no significant problems of manageability.  The superiority and manageability requirements of Rule 23(b)(3) are thus satisfied.

88.    Alternatively, a class action is appropriate under Rule 23(c)(4)(A) with respect to particular issues.

## VIII.  PLAINTIFFS' CLAIMS FOR RELIEF

### Count I – Negligence Per Se

89.    For the purposes of Count I, Plaintiffs repeat and reallege all previous paragraphs above as though fully set forth herein.

90.    Monsanto's acts and/or omissions as described above constitute negligence per se.  Monsanto had a regulatory duty to the Class Members to test,

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

grow, store, transport and dispose of genetically-engineered wheat and associated

seeds following field testing in a manner that would not result in contamination of

the wheat market  prior to regulatory approval.

91.    Monsanto breached this duty by testing, growing, storing,

transporting and disposing of genetically-engineered wheat in such a manner as to

prevent contamination of wheat fields in the future.

92.    Such breaches are the direct and proximate causes of the damages

suffered by Plaintiffs and the other Class Members as outlined herein.

93.    Plaintiffs and the other Class Members have suffered injury and

property damage by the testing, growing, storing, transporting and disposal of

genetically-engineered wheat as outlined herein and seek compensatory damages

requiring that Monsanto decontaminate their farming, harvesting and

transportation equipment, and their on-farm storage facilities, and take other

actions as necessary to prevent contamination in future growing seasons and

beyond.  Plaintiffs further seek, on behalf of themselves and all other members of

the Class, punitive damages as a result of Monsanto's reckless and willful

conduct, and all costs and attorneys' fees as allowed by law.

## Count II – Negligence

94.    For the purposes of Count II, Plaintiffs repeat and reallege all

previous paragraphs above as though fully set forth herein.

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

95.     Monsanto's acts and/or omissions as described above constitute negligence.

96.     Monsanto had a duty to the Class Members to test, grow, store, transport and dispose of genetically-engineered what in a manner that would not result in contamination of neighboring wheat crops or in the contamination of Class Members' wheat during the storage, shipment, and other processes that constitute the supply chain.

97.     Monsanto breached this duty by testing, growing, storing, transporting and disposing of genetically-engineered wheat in violation of (1) standards that would prevent contamination of wheat fields in the future and (2) standards that would prevent contamination of the storage, shipment, and wheat supply chain in the future.

98.     In addition, or in the alternative, Monsanto had a duty to refrain from testing, growing, storing, transporting and disposing of genetically-engineered wheat in a manner that would foreseeably cause harm to Plaintiffs and the other members of the Class.

99.     Monsanto breached this duty by failing to exercise reasonable care to prevent the foreseeable contamination of the Pacific Northwest's soft white wheat through cross-pollination or commingling that would naturally result from the

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

testing, growing, storing, transporting and disposing of genetically-engineered wheat as outlined herein.

100.    Such breaches are the direct and proximate causes of the damages suffered by Plaintiffs and the other Class Members as outlined herein.

101.    Plaintiffs and the other Class Members have suffered injury and property damage by the testing, growing, storing and disposing of genetically-engineered wheat by Monsanto as outlined herein and seek compensatory damages and injunctive relief requiring that Monsanto decontaminate their farming, harvesting and transportation equipment, and their on-farm storage facilities, to prevent future contamination.  Plaintiffs further seek, on behalf of themselves and all other members of the Class, punitive damages as a result of Monsanto's reckless and willful conduct, and all costs and attorneys' fees as allowed by law.

### Count III - Public Nuisance

102.    For the purposes of Count III, Plaintiffs repeat and reallege all previous paragraphs above as though fully set forth herein.

103.    Monsanto has created a public nuisance by causing contamination of soft white wheat with genetically-engineered wheat, which constitutes an unreasonable and significant interference with public rights, public health, public comfort and public convenience.

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

104.   This substantial interference is imposed on the community at large and on a considerable and diverse number of persons.  It arises from: (a) the testing, growing, storing, transporting and disposing of genetically-engineered wheat by Monsanto without adequate limitations to prevent contamination; and/or (b) the testing, growing, storing, transporting and disposing of genetically-engineered wheat with the knowledge that it would contaminate soft white wheat by commingling; and/or (c) the testing, growing, storing, transporting and disposing of genetically-engineered wheat with the knowledge that it could contaminate the human food supply prior to regulatory approval.

105.   Plaintiffs and the other Class Members have suffered injury from Monsanto's public nuisance distinct from that suffered by the general public in that they suffer business losses in the form of rejection of their wheat crops by certain markets (especially foreign exports), reduced or restricted demand for their crops in certain markets, reduced price for their crops at market, added costs for segregation in order to sell their crops, and contamination of their property.

106.   Plaintiffs and the other Class Members seek compensatory damages and injunctive relief requiring abatement of the public nuisance by mandating that Monsanto decontaminate their farming, harvesting and transportation equipment, and their storage facilities, to prevent future contamination, and also seek punitive

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1  damages as a result of Monsanto's reckless and willful conduct, and all costs and

2  attorneys' fees as allowed by law.

3

4  **Count IV – Private Nuisance**

5      107.   For the purposes of Count IV, Plaintiffs repeat and reallege all

6  previous paragraphs above as though fully set forth herein.

7      108.   Monsanto has created a private nuisance through the testing,

8

9  growing, storing, transporting and disposing of genetically-engineered wheat.

10  Monsanto conducted field testing without instituting adequate safeguards to

11  prevent against cross-pollination or commingling that could result when

12

13  genetically-engineered wheat pollen or seeds contaminate neighboring crops or

14  fields.  As a result, the soft white wheat farming and production chain, including

15  but not limited to, farmland, equipment, storage facilities, harvesting equipment,

16

17  transportation facilities and equipment potentially are contaminated with

18  genetically-engineered wheat.

19      109.   Monsanto's acts and/or omissions constitute the unreasonable,

20

21  unusual, or unnatural use of its property in a manner that substantially impaired

22  the right of Plaintiffs and the other members of the Class to the peaceful

23  enjoyment of their property.

24

25      110.   The interference with the use and enjoyment of the property caused

26  by Monsanto is substantial, unreasonable, and ongoing, as evinced by the fact that

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 35

genetically-engineered wheat was discovered on an Eastern Oregon farm in May 2013, approximately 12 years after Monsanto's field testing in Oregon had concluded.

111.   Plaintiffs and the other Class Members seek compensatory damages and injunctive relief requiring abatement of the private nuisance by mandating that Monsanto decontaminate their farming, harvesting and transportation equipment, and their on-farm storage facilities, and take other action necessary to prevent future contamination, and also seek punitive damages as a result of Monsanto's reckless and willful conduct, and all costs and attorneys' fees as allowed by law.

## Count V – Strict Liability

112.   For the purposes of Count V, Plaintiffs repeat and reallege all previous paragraphs above as though fully set forth herein.

113.   Monsanto tested genetically-engineered wheat, a defective and unreasonably dangerous product, which, when used as anticipated, produced wheat unapproved by regulatory authorities that became commingled with Plaintiffs' and all other members of the Class' soft white wheat and contaminated their wheat crops.

114.   The testing, growing, storing, transporting and disposal of genetically-engineered wheat has resulted in the contamination of wheat fields,

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

causing export markets to restrict, or ban altogether, importation of soft white wheat.  Export and domestic markets are now and/or will continue to impose stringent testing and authorization requirements on soft white wheat sellers.  As a result of such market conditions, wheat farmers are suffering and will continue to suffer injuries in the form of depressed wheat prices and increased producer costs.

115.    Exercise of reasonable care could not have eliminated the risk of such contamination and resulting injuries.

116.    Monsanto's testing, growing, storing, transporting and disposal of genetically-engineered wheat not approved by regulatory authorities has caused unprecedented damage to Plaintiffs and all other members of the Class.

117.    Given the structure and operation of the U.S. wheat production and handling system, Monsanto's testing, growing, storing, transporting, and disposing of genetically-engineered wheat was improper.

118.    Any benefit derived from the field testing program of genetically-engineered wheat from 1998 to 2005 is greatly outweighed by the harms resulting from contamination of soft white wheat.

119.    Plaintiffs and the other Class Members seek compensatory damages and injunctive relief mandating that Monsanto decontaminate their farming, harvesting and transportation equipment, and their on-farm storage facilities, and take other actions necessary to prevent future contamination, and also seek

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1    punitive damages as a result of Monsanto's reckless and willful conduct, and all

2    costs and attorneys' fees as allowed by law.

3                      **Count VI – Declaratory Judgment**

4

5         120.   For the purposes of Count VI, Plaintiffs repeat and reallege all

6    previous paragraphs above as though fully set forth herein.

7

8         121.   An actual case and controversy exists between the parties, within the

9    meaning of 28 U.S.C. § 2201 (declaratory judgments), with respect to

10   Defendant's failure to prevent the contamination of soft white wheat by its

11   genetically engineered wheat.

12

13        122.   The Plaintiffs, on behalf of themselves, their constituent members

14   and all other similarly situated, are entitled to judgment declaring that the

15   practices of Defendant are unlawful and are entitled to further relief pursuant to

16

17   28 U.S. C. § 2202.

18                     **IX.  REQUEST FOR RELIEF**

19

20        WHEREFORE, Plaintiffs, individually and on behalf of the other members

21   of the Class proposed in this Complaint, respectfully request that the Court enter

22   judgment in their favor and against Defendant, as follows:

23

24        A.      That the Court certify the Class pursuant to Rules 23(a), 23(b)(2),

25   and 23(b)(3), and designate the named Farmer Plaintiffs as the representative of

26   the Class;

---

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 38

**TERRELL MARSHALL DAUDT & WILLIE PLLC**
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

B.     That the Court adjudge and decree that Monsanto is liable to

Plaintiffs and the members of the Class for:

      1.     Negligence per se,

      2.     Negligence,

      3.     Public Nuisance,

      4.     Private Nuisance,

      5.     Strict liability, and

      6.     Conversion;

C.     That the Court order Monsanto:

      1.     Pay compensatory and consequential damages,

      2.     Pay exemplary and punitive damages,

      3.     Undergo injunctive relief requiring the decontamination of

Class Members' farmland, farming, harvesting, and transportation equipment, as

well as their on-farm storage facilities, to prevent contamination for the future

growing seasons,

      4.     Pay the costs of this action, including attorneys' fees and

expenses, and

      5.     Pay pre- and post- judgment interest;

D.     That the Court declare that the acts of Monsanto described herein are

unlawful; and

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 39

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

E.     That the Court grant Plaintiffs such other and additional relief as the

Court deems equitable, appropriate, and just.

## X.  JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

RESPECTFULLY SUBMITTED AND DATED this 6th day of June,

2013.

TERRELL MARSHALL DAUDT
& WILLIE PLLC

By:   /s/ Beth E. Terrell, WSBA #26759
     Beth E. Terrell, WSBA #26759
     Michael D. Daudt, WSBA #25690
     Michael F. Ram, *of Counsel*
     Attorneys for Plaintiffs
     936 North 34th Street, Suite 400
     Seattle, Washington  98103-8869
     Telephone:  (206) 816-6603
     Facsimile:  (206) 350-3528
     Email:  bterrell@tmdwlaw.com
     Email:  mdaudt@tmdwlaw.com
     Email:  mram@rocklawcal.com

     George A. Kimbrell, WSBA #36050
     Donna F. Solen
     Attorneys for Plaintiffs
     KIMBRELL KIMBRELL & SOLEN LLC
     660 Pennsylvania Avenue, SE, Suite 302
     Washington, D.C. 20003
     Telephone: (202) 547-9359
     Facsimile: (202) 547-9429

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com

1

Richard S. Lewis
Email:  rlewis@hausfeldllp.com

2

James J. Pizzirusso
Email:  jpizzirusso@hausfeldllp.com

3

Mindy B. Pava
Email: mpava@hausfeldllp.com

4

Attorneys for Plaintiffs

5

HAUSFELD LLP

6

1700 K Street, NW Suite 650

7

Washington, D.C. 20006
Telephone: (202) 540-7200

8

Facsimile: (202) 540-7201

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF - 41

TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.350.3528
www.tmdwlaw.com